# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| GARFIELD JOHN JOSEPH LANDRY | * | CIVIL ACTION NO. 13–0226 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Garfield John Joseph Landry, born April 13, 1959, filed applications for a period of disability, disability insurance benefits and supplemental security income on January 6, 2011, alleging disability since September 11, 2010, due to degenerative disc disease of the lumbar and cervical spines, left shoulder tendonitis and illiteracy.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the

Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Dr. John Cobb dated September 11, 2010 to January 3, 2011**.  On September 11, 2010, claimant reported shoulder pain after an on-the-job injury.  (Tr. 174).  He was working at light duty at that time.

On examination, claimant had full range of motion of the cervical spine, positive Spurling's test on the left, depressed DTRs on the left, weakness of the left thumb extensors three out of five, and left hand swelling.  (Tr. 176-77).  Cervical motor and sensory function and grip strength were normal.  (Tr. 177).  On left shoulder examination, he had positive impingement and some prominence of the acromioclavicular joint.

Cervical spine x-rays showed spondylosis at C4-5 on the right.  C5-6 was worse with formaminal narrowing nearing the uncinate processes, right greater than left.

Dr. Cobb's impression was post-traumatic cervical pain syndrome, sprain/strain cervical spine, possible herniated disc, spondylosis with narrowing,

worse at the C5-6 level, radiculitis in the left upper extremity in the C6 distribution, rotator cuff injury on the left, and impingement tendonitis on the left. He injected the left shoulder and prescribed Percocet.  He stated that claimant was unable to work at that time.  (Tr. 178).

A cervical spine MRI dated November 8, 2010, showed a small central protrusion which mildly indented the ventral cervical cord with mild canal stenosis at C4-5; mild to moderate canal and moderate to severe bilateral foraminal stenosis at C5-6, and moderate bilateral foraminal stenosis at C6-7.  (Tr. 179).

On November 22, 2010, claimant continued to complain of problems on both sides of his neck and back pain.  (Tr. 181).  On examination, he had some weakness of the extensors of the left thumb.  Thoracolumbar x-rays showed mild spondylosis with good alignment.

Dr. Cobb's assessment was disc protrusions at C4-5 and C5-6, some degeneration at the C6-7 level, bursitis of the left shoulder with inflammation and impingement, rotator cuff tear, thoracolumbar pain syndrome and mild spondylosis in the thoracic area.  He recommended that claimant continue with physical therapy and injections at C5-6 and C6-7.  (Tr. 182).  He prescribed Lortab.

A lumbar MRI dated December 22, 2010, showed a central left lateral focal disc herniation, posterior displacement of the left L5 nerve root within the spinal canal and possible compromise of the L4 nerve root within the neural foramina at L4-5, and a right lateral disc herniation with possible compromise of the S1 nerve root at L5-S1.  (Tr. 183).  An MRI of the thoracic spine was normal.  (Tr. 185).

On January 3, 2011, claimant indicated that his shoulder was doing better.  (Tr. 186).  On examination, he had some nerve symptoms in the left upper extremity.  The impression was impingement of the left shoulder with mild rotator cuff strain and radiculitis in the left upper extremity in the C6 distribution, which had improved.  Dr. Cobb recommended continued physical therapy for the shoulder.

**(2) Consultative Examination by Dr. Andrea Murina dated March 5, 2011**.  Claimant complained of lower back pain radiating down to the knees, especially on the right side; left rotator cuff tear; cervical radiculitis; tendonitis, hand stiffness and swelling, and headaches three times a week.  (Tr. 188).

Claimant had a little trouble dressing himself, and no problem feeding himself.  He could stand for 15 minutes at one time and approximately 20 minutes in an eight-hour period.  He could walk approximately one block and lift approximately 10 pounds.  He did not drive.

4

On examination, claimant had no difficulty getting on and off the exam table.  (Tr. 189).  He took off his shoes with his right hand and was able to unbuckle his belt without any difficulty.

On spine/extremities exam, claimant's pulses were +2 and grip strength was 5/5.  He was able to oppose finger to thumb and button and pick up a coin.  He had no muscle atrophy in the hand.

Claimant was able to walk on his heels, toes, and perform tandem walking without difficulty.  (Tr. 190).  He was able to squat without difficulty.  He had intact sensation to light touch, and had no sensory deficits in the hands or feet.  Deep tendon reflexes were +2 in the extremities.

Dr. Murina noted that claimant was obvious in attempts to use his right arm instead of the left, except that he used both when undressing.  She observed that although claimant alleged back pain that was severely limiting, he had normal muscle tone, range of motion and muscle strength in the upper extremities.  Straight leg raises were negative bilaterally, and gait was normal.

Additionally, Dr. Murina found that claimant had normal range of motion in the shoulder.  He had no difficulty in lateral rotation, flexion or extension of the neck.  He had no hand swelling and no detectable sensory deficits of the hand.

Dr. Murina opined that claimant had no limitation in activity in terms of standing and sitting.  She found that he should be able to lift and carry 50 to 100 pounds without difficulty.  She determined that he had no postural or environmental limitations.  He required no assistive devices.

**(3) Records from Dr. John Cobb dated February 7, 2011 to July 27, 2011**.  On February 7, 2011, claimant reported that physical therapy had helped his neck and shoulder, but did not help his back.  (Tr. 192).  He had discontinued PT. He complained that his neck and shoulder bothered him if he turned too fast, and that his lower back pain radiated down his left leg to the knee.  He stated that Lortab no longer relieved his pain.

On examination, claimant had normal cervical posture, full range of motion, and normal lumbar stance, posture and gait.  DTRs were trace of the left patella compared to 2+ on the right, which suggested the L4 nerve.  He had no weakness. Straight leg raise was negative.

Dr. Cobb's assessment was disc protrusion at L4-5 on the left with L4 nerve symptoms on the left, impingement of the left shoulder with mild rotator cuff deficiency, cervical spondylosis with disc protrusion and improved radiculitis, and mild degeneration in the thoracic spine.

On March 23, 2011, claimant indicated that his left shoulder was improving, but he could not raise his arm like he did before.  (Tr. 194).  He also complained of low back and anterior left thigh muscle pain, and stiffness and pain in the left ring finger.  He stated that his neck was a little better, but he still could not turn his head normally.

On examination, claimant had normal cervical posture.  His range of motion in the left shoulder was fairly normal.

Dr. Cobb recommended an epidural steroid injection at L4-5 due to the symptoms in both of claimant's lower extremities.  He encouraged claimant to exercise his shoulder and use it for normal activity to improve his strength and range of motion.  He prescribed Percocet.  Dr. Cobb determinated that claimant was unable to work at that time.

On July 27, 2011, claimant elected not to proceed with the injection.  (Tr. 196).  He requested a discharge from care at that time.  Dr. Cobb stated that since claimant had elected not to proceed with the recommended treatment, no further treatment was required in his office.  He discharged claimant from his care.

**(4) Report from Dr. John R. Budden dated March 18, 2011**.  On March 18, 2011, claimant voiced multiple complaints.  (Tr. 197).  Throughout the

7

interview and examination, he grimaced in obvious discomfort, holding his eyes closed or squinting quite a bit and rarely making direct eye contact.

Dr. Budden noted that claimant admitted that he was ambidextrous; that is, he threw with his left upper extremity, and wrote with his right upper extremity. (Tr. 198).  He complained of left shoulder pain associated with left hand swelling and occasional popping, mild midline low back pain, and intermittent left-sided neck pain.

Dr. Budden had initially evaluated claimant on September 15, 2010.  (Tr. 199).  At that time, he had complained of left-sided neck pain radiating to his left shoulder and elbow with hand numbness.  Dr. Budden noted that claimant "appeared to be very theatrical" regarding his pain complaints.  (Tr. 244).  His examination was suboptimal due to the intense pain he reported.  (Tr. 199).  Left shoulder x-rays were unremarkable.

The cervical MRI dated September 17, 2010, showed moderate left-sided foraminal stenosis at C6 due to disc and bone complex.  (Tr. 199, 246-47).  Left shoulder MRI revealed a small rotator cuff tear associated with impingement.  (Tr. 199, 248-49).

Dr. Budden saw claimant again on September 22, 2010, and October 6, 2010.  (Tr. 199).  At the October 6 visit, claimant continued to complain of left-

8

sided neck pain radiating down to the fingertips of the left hand.  Dr. Budden

prescribed a Medrol Dose Pack and continuation of physical therapy, and

restricted him to light work activities.  (Tr. 200).  He noted that the visit on

October 6, 2010, was the last time he had evaluated claimant, and that claimant

had failed to show up for a subsequently scheduled return office visit.

At claimant's examination on March 28, 2011, his deep tendon reflexes

were 2+ and symmetrical.  (Tr. 198).  Reverse seated straight leg raising on the left

at 90 degrees produced complaints of left buttock and left-sided low back pain.

Straight leg raising bilaterally was negative at 90 degrees while seated.

Claimant complained of significant discomfort with light palpation

overlying the midline of the lower lumbar spine, but no muscle spasms were

palpable.  He was able to heel and toe stand while supporting himself against the

exam table.  He had no muscular atrophy of either lower extremity.  Gross muscle

strength was intact.

Claimant was able to bend forward at the waist, lacking approximately 14

inches of being able to touch his toes.  Side-to-side bending was unrestricted.

Lumbar spine hyper-extension was unremarkable.

On cervical spine examination, claimant had a moderate active range of

motion.  (Tr. 199).  He complained bitterly of discomfort with forward flexion.  He

also complained of pain while Dr. Budden palpated lightly overlying the left

paracervical spine and left trapezius muscle; however, no muscle spasms were

palpable.

Claimant exhibited a negative Tinel sign with percussion over overlying the

ulnar nerve at the left elbow and the left flexor wrist crease.  Upper extremity

strength was equal and strong.  No thenar atrophy was evident.  Sensory exam of

the upper extremity dermatones did not reveal any abnormality.

On left shoulder exam, claimant abducted the shoulder only to 70 degrees,

stating that further abduction produced exquisite pain.  However, Dr. Budden was

able to passively take the shoulder through a full range of motion.  No crepitus or

shoulder girdle atrophy or asymmetry was evident.

Dr. Budden opined that the majority of claimant's symptoms were likely due

to an aggravation of pre-existing degenerative changes affecting the cervical

spine, with a small portion possibly attributable to impingement syndrome and/or

the small rotator cuff tear of the left shoulder.  (Tr. 202).  He recommended CESIs

and continuation of physical therapy.  (Tr. 215-18).  He stated that surgery was not

indicated for either the cervical or left shoulder complaints.  (Tr. 202).

Additionally, Dr. Budden opined that claimant would be capable of

returning to a light work position, and that returning him to work would likely

hasten his recovery.  He further found that claimant had not sustained any permanent physical impairment as a result of his work injury, and that his symptoms should slowly respond to non-operative treatment.

**(5) Claimant's Administrative Hearing Testimony**.  At the hearing on November 29, 2011, claimant testified that he had last worked in the oil field as a water blaster.  (Tr. 22).  He reported that he had stopped working after two years on that job because of a work injury in September, 2010.  (Tr. 22-23).  Before that, he had worked seasonally as a tractor driver in the sugar cane industry.

Claimant testified that he had completed the 10th grade.  (Tr. 24).  He reported that he could not read and write in English.  (Tr. 24).  In fact, he stated that he could not read at all.  When the ALJ asked how he had gotten to the 10th grade, claimant responded that the teacher had socially promoted him because of good behavior.

Regarding complaints, claimant testified that he had injured his left shoulder, neck and back in 2010.  (Tr. 26).  He complained that steroid injections had not helped.  He reported that physical therapy had helped, but worker's comp stopped paying for it.  (Tr. 27).  He said that he was continuing to receive worker's comp benefits.  (Tr. 27-28).

Claimant testified that he was still having trouble with his neck, shoulder and back.  (Tr. 29).  He reported that he could not pick up his arm all the way up. He stated that he could not lift overhead.  (Tr. 30).

Claimant stated that he was right-handed.  He reported that he could write "some", and could copy things.  Additionally, claimant testified that he could move his neck from side to side, but had to look up and down slowly.  (Tr. 31).

Regarding activities, claimant testified that he did not drive.  (Tr. 32).  He stated that he had not renewed his driver's license for 10 years because he did not have a car.  He reported that he grocery shopped.  (Tr. 33).

As to restrictions, claimant testified that he did not walk far, but did go outside to get the newspaper.  He stated that he did not do house work, because he could use only one hand.  (Tr. 34).

Claimant testified that he was not taking any medications.  (Tr. 35).

**(6) Administrative Hearing Testimony of Beverly Majors, Vocational Expert ("VE")**.  Ms. Majors classified claimant's past work as a farm laborer as heavy with a Specific Vocational Preparation ("SVP") of two, a sandblaster as medium with an SVP of two, and a water blaster as heavy with an SVP of three. (Tr. 40).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant with the same education and background, who could perform no greater

than light work; had to avoid extreme cold temperatures; could not climb ropes, ladders, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and could not reach overhead with his left upper extremity.  (Tr. 41-42).  In response, Ms. Majors testified that he could work as a food preparation worker, of which there were 114,633 jobs nationally and 2,667 statewide; janitor, of which there were 371,379 light jobs nationally and 6,291 statewide, and a light grounds maintenance worker, of which there were 21,946 jobs nationally and 301 statewide.  (Tr. 42).

When the ALJ added the limitation that claimant could only occasionally rotate his neck to the left, the VE testified that he could still do those jobs.  (Tr. 42-43).  The ALJ then added a limitation to lifting with his left upper extremity only to the waist level.  In response, the VE opined that he could not do the grounds keeper job.  (Tr. 43-44).  When the ALJ asked whether claimant could do those jobs if he had to alternate between sitting and standing at will throughout the workday, Ms. Majors testified that he could not.  (Tr. 44).

Claimant's attorney posed a hypothetical in which he asked the vocational expert to assume that claimant was unable to read and write.  (Tr. 45).  In response, Ms. Majors stated that those jobs would be eliminated.  Next, he asked the VE to assume that claimant had a neck and left shoulder injury causing him to

have constant aching, burning and tingling in his left shoulder radiating to his left arm with left hand tingling; that he had significant enough pain that it woke him up at night or when he increased activities; that he had left arm weakness which worsened with use; that he could lift his left arm only to waist level; that he had restriction in motion of his neck such that he could only occasionally move his neck to the right; that he had difficulty moving his neck to the left, and that he could not read and write.  (Tr. 46-47).  In response, she stated that there would be no jobs available.  (Tr. 47).

(7) The ALJ's Findings.  Claimant argues that: (1) the ALJ's finding that his impairment did not meet the listings for spinal injuries is not supported by substantial evidence; (2) the ALJ failed to consider and discuss all relevant evidence concerning claimant's literacy, and (3) the ALJ failed to consider and discuss all relevant evidence to determine his proper residual functional capacity ("RFC").

First, claimant argues that he meets the listing at § 1.04(A), which provides, in pertinent part, as follows:

> **1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

14

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P, App. 2, § 1.04(A).

In the Decision, the ALJ specifically considered claimant's alleged back impairment under Section 1.00 of the Listings of Impairments.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00.  (Tr. 10).  She determined that although claimant's impairments were "severe" within the meaning of the Social Security Regulations, they were not "severe" enough to meet or medically equal, either singly or in combination, one of the impairments under the Listings.

At claimant's February 7, 2011, examination with his treating physician, Dr. Cobb, claimant had normal cervical posture, full range of motion, normal lumbar stance, posture and gait, no weakness, and negative straight leg raise.  (Tr. 192). His last exam dated March 23, 2011, revealed normal cervical posture and fairly normal left shoulder range of motion.  (Tr. 194).

In the consultative report, Dr. Murina noted that claimant was obvious in attempts to use his right arm instead of the left, except that he used both when undressing.  (Tr. 190).  She observed that although claimant had alleged back pain

15

that was severely limiting, he had normal muscle tone, range of motion and muscle strength in the upper extremities.  Straight leg raises were negative bilaterally, and gait was normal.  Range of motion in the shoulder and neck were normal.  He had no hand swelling and no detectable sensory deficits of the hand.

At claimant's last examination with Dr. Budden, his deep tendon reflexes were 2+ and symmetrical, and straight leg raising bilaterally was negative at 90 degrees while seated.  (Tr. 198).  He had no muscular atrophy of either lower extremity, and gross muscle strength was intact.  Upper extremity strength was equal and strong, and sensory exam did not reveal any abnormality.  (Tr. 199).

For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  (emphasis in original).  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990).  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  *Id*.  As claimant has not demonstrated that he met the criteria under § 1.04, the ALJ's finding that claimant's impairments did not meet this listing is entitled to deference.

Next, claimant argues that the ALJ erred in failing to find that he was illiterate.

16

The ALJ found that claimant had a "limited" education and was able to communicate in English.  (Tr. 13).  In reaching this determination, she noted that while claimant had initially testified that he could not read or write, he later testified that he "writes" with his right hand.  (Tr. 12, 30).  Additionally, claimant admitted to Dr. Budden that he wrote with his right hand.  (Tr. 198).  Further, the ALJ stated that school records did not indicate illiteracy and, in fact, noted that claimant had potential.  (Tr. 12, 170).

Moreover, the ALJ noted claimant's testimony that he walked outside and retrieved the newspaper, which indicated that he read the newspaper on a daily basis.  (Tr. 12, 33).  She concluded that as such, claimant's testimony regarding his literacy was credible only to the extent it was consistent with the findings therein.  (Tr. 12).  It is well established that the ALJ's finding as to credibility is entitled to great deference.  *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).   Thus, this argument lacks merit.

Finally, claimant argues that the ALJ erred in assessing his residual functional capacity.

The ALJ noted that Dr. Cobb had placed claimant at "no work status."  (Tr. 13, 194).  Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work."

*Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (citing 20 C.F.R. §

1527(e)(1)).  These determinations are legal conclusions that the regulation

describes as "reserved to the Commissioner."  *Id*.  As the ALJ, not the physician,

has sole responsibility for determining a claimant's disability status, Dr. Cobb's

opinion is not dispositive.

      In reaching her conclusion that claimant had the RFC to perform light work,

the ALJ gave "some weight" to the opinion of Dr. Budden, who released claimant

to sedentary/light work with restrictions to lifting/carrying 20 pounds and the

inability to perform any overhead work.  (Tr. 13, 202).  However, the ALJ found

that claimant had no limitations to over-the-shoulder work, giving "significant

weight" to Dr. Murina's opinion that claimant could lift/carry 50 to 100 pounds,

had normal muscle tone and normal range of shoulder motion, and had no

limitations as to standing and sitting.  (Tr. 13, 190).  Additionally, she gave "little

weight" to the state agency medical consultant's opinion that claimant could

perform medium work, finding that claimant's limitations were more limiting.  (Tr.

13, 62-63).  As the ALJ's determination is supported by substantial evidence, it is

entitled to deference.

      Additionally, the ALJ noted that claimant had sought very little, if any,

medical treatment for his allegedly disabling impairments.  (Tr. 12).  Claimant

testified that he did not recall when his next appointment with a doctor was, and that he was not going to a doctor at that time.  (Tr. 34).  It is well established that the ALJ is not precluded from relying upon the lack of treatment as an indication of nondisability.  *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Doss v. Barnhart,* 137 Fed.Appx. 689, 690 (5th Cir. 2005) (failure to seek treatment is indication of nondisability); *McGuire v. Commissioner of Social Security*, 178 F.3d 1295, *7 (6th Cir.1999) (gaps in treatment may reasonably be viewed as inconsistent with a claim of debilitating symptoms).

Further, the ALJ cited claimant's testimony that he was not taking any pain medication.  (Tr. 12).  The records show that claimant was not taking any medications.  (Tr. 35).  This indicates that claimant's pain was not disabling.  *See Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling condition); *Carlin v. Commissioner of Social Security Administration*, 2013 WL 6665713, *6 (W.D. La. Dec. 17, 2013).

Moreover, the ALJ observed that claimant had been non-complaint with treatment and had voluntarily ceased treatment on a few occasions.  (Tr. 12).  Dr. Budden noted that after his evaluation on October 6, 2010, claimant failed to show up for a subsequently scheduled return office visit.  (Tr. 200).  At claimant's last

19

appointment with Dr. Cobb on July 27, 2011, claimant elected not to proceed with the recommended injection.  (Tr. 196). It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 404.1530(a), (b);  *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

Claimant also argues that the ALJ erred in failing to include his illiteracy in the hypotheticals to the vocational expert.  However, as stated above, the ALJ did not accept the allegation as to claimant's illiteracy.  It is well established that the ALJ is not bound by VE testimony which is based on evidentiary assumptions ultimately rejected by the ALJ.  *See Owens v. Heckler,* 770 F.2d 1276, 1282 (5th Cir.1985).

Here, the ALJ rejected claimant's testimony based on the evidence of record.  As the ALJ's hypotheticals to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or her representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference.  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed May 16, 2014, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE